# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00790-COA

**KENYA CLAY** APPELLANT

v.

**STATE OF MISSISSIPPI** APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 06/24/2021 |
| TRIAL JUDGE: | HON. MARK SHELDON DUNCAN |
| COURT FROM WHICH APPEALED: | NESHOBA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: SCOTT STUART |
| DISTRICT ATTORNEY: | STEVEN SIMEON KILGORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/16/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## BEFORE CARLTON, P.J., McDONALD AND EMFINGER, JJ.

### EMFINGER, J., FOR THE COURT:

¶1.     After a jury trial on June 16, 2021, Kenya Clay was found guilty of uttering a forgery and sentenced to serve a term of five years in the custody of the Mississippi Department of Corrections (MDOC) as a nonviolent habitual offender pursuant to Mississippi Code Annotated section 99-19-81 (Supp. 2018).  Clay's sole issue on appeal is that the trial court deprived him of his right to assert his theory of defense by refusing his mistake-of-fact jury instruction D-11.

## FACTS AND PROCEDURAL HISTORY

¶2.     Kenya Clay entered Cadence Bank in Philadelphia, Mississippi, on November 4, 2019, and attempted to cash a check on the account of Dr. Roger Nunez in the amount of $2,300.80. The memo line of the check read "paid for four-wheeler." Clay presented the check to a teller. Before cashing the check, teller Gloria Wilkerson consulted with loan officer Christen Boler. Boler testified that she questioned Clay about the check, and Clay told her that he had sold an ATV to "Mr. Nunez." When questioned further by Boler, Clay could not name the type of ATV; he just said it was a big ATV. Pursuant to bank policy, Boler testified that she compared the signature on the check with the signatures on file for Dr. Nunez, and she found they did not match. Further, because the check was for more than $500, the teller contacted the bank's customer, Dr. Nunez, who advised her that he did not write or authorize the check. The police were called to the scene, and Clay was taken in for questioning.

¶3.     After advising Clay of his *Miranda*[1] rights, Investigator Bobby Pattillo interviewed Clay at the Philadelphia Police Department. Pattillo testified that Clay gave both a verbal and written statement. According to Pattillo, Clay claimed he had been given the check by "J.C. and Ashley" to cash as payment for a four-wheeler. Clay could not give any further identifying information for "J.C." or "Ashley." Clay also could not give Pattillo any additional information about the four-wheeler. After talking with Pattillo, Clay gave the following written statement:

> [I] [d]idn't know the check was stolen[.] J.C. and Ashley wrote the check out
> to me for a four[-]wheeler, brought me to the bank and said it was legit. [I]

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[f]ound out that it wasn't. When the police pull[ed] up[,] they left me, right then I knew th[ere] was something wrong.

¶4. Dr. Nunez identified the check in question as being one drawn on his checking account at Cadence Bank. He stated that he did not write the check and did not sign the check. Further, he did not authorize anyone else to write and/or sign the check. He testified that he did not know Clay and never bought a four-wheeler from him. Dr. Nunez testified that he did not know Ashley Williams or J. C. Nowell. He could only guess that the check may have been stolen during his open house on the week of Halloween. He did not know if other checks were missing, but he canceled that bank account.

¶5. Clay did not testify at trial and called Williams as his only witness. Williams testified that she had known Clay for about six months before the date at issue. She also identified "J.C." as J.C. Nowell, a friend of hers since childhood. Williams testified that Nowell and Clay had met at her house the week before November 4, 2019. She stated that Nowell and Clay had a shared interest in racing four-wheelers. Williams indicated that on November 4, Nowell came by her house and she went with him to Clay's house in Union. She testified that Nowell had a check that was blank, except there was a signature on the check. Nowell told Williams to fill out the check, and she wrote what he told her to write. Nowell gave Clay the check while they were at Clay's house. After giving Clay the check, they all three went together to the bank in Philadelphia. When Clay went into the bank, she and Nowell stayed in the truck. Williams admitted that she was supposed to be given some money for writing out the check. She did not know how much she would receive, but she thought they were going to "go gambling a little bit" with the money. She thought Clay would get $1,500

3

for the four-wheeler, but she was not sure. Williams testified that Nowell "took off" when the police arrived at the bank, and they went to the casino.

¶6. On cross-examination, Williams admitted that she and Nowell were under the influence of methamphetamine and marijuana at the time of these events. Williams stated that Clay was also under the influence of marijuana at the time because "we smoked a blunt together." She said that Clay was supposed to get $1,500 for the four-wheeler, but she wrote the check for $2,300 so Nowell would get some extra money. She further testified as follows:

> Q. Isn't it true y'all were going to get more drugs with the extra money?
>
> A. Yes.
>
> Q. And that's -- isn't it true that's why the check was for more than the cost of the four[-]wheeler?
>
> A. That and gambling.
>
> Q. This extra money above the cost of the four-wheeler -- were all three of you going to get drugs with it?
>
> A. Yes.

¶7. On June 16, 2021, a jury found Clay guilty of uttering a forgery pursuant to Mississippi Code Annotated sections 97-21-59 and 97-21-33(1)(b) (Rev. 2014). Clay was sentenced on June 24, 2021, to serve five years in the custody of the MDOC as a nonviolent habitual offender. On July 2, 2021, Clay filed a motion for a new trial and other relief, which was denied pursuant to an order entered by the court on the same day. Clay's notice of appeal also was filed on July 2, 2021.

4

## STANDARD OF REVIEW

¶8. "When jury instructions are challenged on appeal, we are mindful that trial courts are given considerable discretion regarding the instructions' form and substance." *Roberson v. State*, 19 So. 3d 95, 99 (¶3) (Miss. Ct. App. 2009). The long-standing standard of review for the trial court's giving or refusing jury instructions is an abuse of discretion. *Taylor v. State*, 109 So. 3d 589, 595 (¶18) (Miss. Ct. App. 2013) (citing *Victory v. State*, 83 So. 3d 370, 373 (¶12) (Miss. 2012)). "When reviewing the giving or refusal of jury instructions, we do not view the jury instructions in isolation, but instead we consider them as a whole." *Id*. (citing *Rushing v. State*, 911 So. 2d 526, 537 (¶24) (Miss. 2005)).

## ANALYSIS

¶9. Clay argues on appeal that he was denied his right to assert his mistake-of-fact defense when the court refused his proposed jury instruction D-11, which stated:

> The defendant has presented evidence that he was ignorant or made a mistake of fact. Ignorance or a mistake of fact is a legal defense to a crime provided that:
>
> > 1. The defendant honestly believed the mistake of fact;
> >
> > 2. The defendant's conduct would have been lawful and proper if the facts had been as he believed them to be; and
> >
> > 3. The defendant's mistaken belief was not based on his own negligence or fault.
>
> If the State did not prove beyond a reasonable doubt from the evidence in this case that the defendant acted knowing the true facts, or that the defendant was responsible for making the mistake of fact, then you shall find the defendant not guilty of uttering forgery.

Clay's defense at trial was that at the time he attempted to cash the check, he did not know

that the check he received from Nowell was stolen from Dr. Nunez and forged. Clay contends that the trial court should have accepted and granted instruction D-11.

¶10. "[A] defendant is entitled to have every legal defense he asserts to be submitted as a factual issue for determination by the jury under proper instruction of the court." *Giles v. State*, 650 So. 2d 846, 849 (Miss. 1995). However, a defendant's entitlement is limited in that "the court may refuse an instruction which incorrectly states the law, **is covered fairly elsewhere in the instructions**, or is without foundation in the evidence." *Victory*, 83 So. 3d at 373 (¶12) (emphasis added).

¶11. In the case at hand, the trial court gave multiple jury instructions explaining the requirements concerning Clay's intent and knowledge. Jury instruction S-1 stated in part:

> [I]f you believe from the evidence in this case beyond a reasonable doubt . . . that the Defendant, Kenya Clay, did **willfully, unlawfully, feloniously and with fraudulent intent**, utter and publish as true to Cadence Bank, a certain forged, altered or counterfeited instrument . . . when the said Kenya Clay, **then and there well knew the same to be forged, altered or counterfeit**, with the willful and felonious intent to defraud . . . , it is your duty to find the Defendant guilty as charged.

(Emphasis added). Further, jury instruction S-5 stated in part:

> [Y]ou may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntarily participated in its commission with the **intent to violate the law**.

(Emphasis added). Jury instruction D-8 stated in part:

> The Court instructs the Jury that **intent to defraud is a necessary element of the indictment against the defendant**, and if from all the evidence and circumstances shown in evidence you believe, or have a reasonable doubt in regard thereto, that at the time of the uttering of the check or negotiable instrument, **the defendant reasonably believed he had the right so to do** by

6

virtue of having been **authorized to do so**, or having been **led to believe same was good and valid**, then you must find the defendant, Kenya Clay, not guilty.

(Emphasis added). Finally, jury instruction D-9 stated in part:

[I]f you find beyond a reasonable doubt from the evidence in this case that:

. . . .

2. **Intending to defraud**, Kenya Clay unlawfully uttered and published as true a forged instrument, **knowing that the instrument was forged**, then you shall find Kenya Clay guilty as charged.

If the State did not prove any one of the above[-]listed elements beyond a reasonable doubt, then you shall find Kenya Clay, not guilty.

(Emphasis added). Each of the above jury instructions was presented for the jury to consider during their deliberations. Each instruction described the importance and requirement for the State to prove Clay's intent and knowledge on November 4, 2019, when he attempted to cash the check at Cadence Bank.

## CONCLUSION

¶12. When the jury instructions are read together as a whole, we find that the jury was adequately instructed as to the required elements of uttering a forgery. The trial court did not abuse its discretion in refusing jury instruction D-11. Therefore, we affirm Clay's conviction and sentence.

¶13. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

7